IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVONNE E. MERRILL,

         Plaintiff,

         v.

CAROLYN COLVIN, Acting
Commissioner of Social Security,

         Defendant.

Case No. 3:14-cv-1429-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, Magistrate Judge**.

      Evonne E. Merrill appeals the Commissioner of Social Security's ("Commissioner") decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court recommends that the District Judge affirm the Commissioner's decision.

1 - FINDINGS AND RECOMMENDATION

# I. BACKGROUND

## A.     Procedural History

On February 15, 2011, Merrill protectively filed an application for DIB, alleging disability since November 7, 2010, due to scoliosis, osteoporosis, right shoulder impingement, and arthritis. After the Commissioner denied her application initially and upon reconsideration, Merrill filed a written request for a hearing before an administrative law judge ("ALJ"). On February 29, 2013, Merrill, represented by counsel, appeared and testified before an ALJ. A vocational expert ("VE") also testified at the hearing.

On March 15, 2013, the ALJ issued a decision finding Merrill not disabled, as defined by the Act. Merrill filed a request for review of the ALJ's decision. On July 9, 2014, the Appeals Council denied Merrill's request for review, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §§ 404.981, 422.210. Merrill timely filed this appeal.

## B.     Factual History

Merrill was 58 years old on the alleged onset date of her disability. She has a high school degree and two years of college. In 1974, Merrill completed training as a certified nursing assistant. She has past relevant work as a nursing assistant, a cook/helper, and a property manager. In 2010, Merrill resigned from her property manager position.

## C.     The ALJ's Decision

The ALJ applied the five-step disability evaluation process. 20 C.F.R. § 404.1520. *See Lester v. Chater,* 81 F.3d 821, 828 n.5 (9th Cir. 1995) (describing the five-step process). At step one, the ALJ found Merrill had not engaged in substantial gainful activity since November 7, 2010, her

alleged onset date. (Tr. 15.)[1] At step two, the ALJ determined Merrill suffered from a number of severe impairments, including "scoliosis, osteoporosis, right shoulder impingement, and arthritis." (Tr. 15.) The ALJ concluded that Merrill was not presumed disabled at step three, because her condition did not meet or equal any of the listed impairments. 20 C.F.R., Pt. 4, Subpt. P, App. 1. (Tr. 15-16.) The ALJ then assessed Merrill's residual functional capacity ("RFC"), and applied this RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(4) ("Before we go from step three to step four, we assess your residual functional capacity. . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ found Merrill had the RFC to:

> lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for a combined total of up to two hours and sit at least six hours in an eight-hour workday, with normal breaks. The claimant should never climb ladders, ropes, or scaffolds. She can stoop, kneel, crouch, and crawl on an occasional basis. She can climb ramps and stairs frequently. She has no limitations on balancing. The claimant is unable to perform overhead reaching with her right upper extremity, but she is able to perform forward reaching frequently and lateral reaching occasionally. She can perform bilateral handling, fingering, and/or feeling on a frequent, not constant, basis. The claimant is likely to be off-task up to five percent of the workday due to waxing and waning of her pain and her reduced ability to manipulate.

(Tr. 16.) Although the ALJ noted that Merrill's testimony about additional limitations would establish a lower RFC, he rejected her subjective testimony as "not credibly supported by the weight of the evidence to the extent inconsistent" with the ALJ's RFC. (Tr. 19, 21.)

On the basis of this RFC assessment and the VE testimony at step four, the ALJ found Merrill was unable to perform her past relevant work. The ALJ determined, however, that Merrill had past work skills that would transfer to other occupations. (Tr. 21.) At step five, the ALJ

---

[1] "Tr." refers to the official transcript of the administrative record. (ECF No. 7.)

determined Merrill was not disabled because she retained the capacity to perform other work that existed in sufficient numbers in the national economy. In making this determination, the ALJ posed a hypothetical question to the VE based upon Merrill's RFC. In response, the VE testified that a person with the specified RFC could perform occupations such as a sorter, credit reference clerk, data examination clerk, and information clerk. (Tr. 22.)

## II. STANDARD OF REVIEW

A district court reviews the Commissioner's decision to ensure the Commissioner applied proper legal standards, and that the ALJ's findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir. 1989). The reviewing court may not substitute its judgment for that of the Commissioner, *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006), or "give vent to feelings of compassion." *Winans v. Bowen,* 853 F.2d 643, 655 (9th Cir. 1987).

## III. DISCUSSION

Merrill argues that this case should be remanded for an award of benefits because the ALJ improperly: (1) weighed the medical evidence, (2) rejected Merrill's credibility, (3) rejected the lay witness testimony, and (4) provided an incomplete hypothetical to the VE. (Pl.'s Brief 4, 8, 14, 16.)

A.      **ALJ's Evaluation of the Medical Source Evidence**

Merrill argues the ALJ improperly weighed the medical evidence. Specifically, Merrill contends that the ALJ erred when he gave significant weight to the opinion of Dr. Seth Kagan, a consultative examiner, and that the ALJ erred by failing to consider Merrill's migraine headaches as a severe impairment.

1.      **Legal Standard**

To establish a physical or mental impairment, a claimant must provide evidence from medical sources. Acceptable medical sources include licensed physicians. 20 C.F.R. § 404.1513(a). Further, there are three types of physician opinions: (1) those who treat the claimant ("treating physician"), (2) those who examine but do not treat the claimant ("examining physician"), and (3) those who neither examine nor treat the claimant, but review the claimant's medical records ("nonexamining physician"). 20 C.F.R. § 404.1527(d); *Holohan v. Massanari,* 246 F.3d 1195, 1201-02 (9th Cir. 2001). Regardless of the type of physician opinion proffered, the ALJ is never relieved of his obligation to consider evidence submitted by each source, and to provide a reason for rejecting that evidence. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Generally, more weight is ascribed to a treating physician's opinion than to the opinions of non-treating physicians. *Holohan,* 246 F.3d at 1201-02; *Lester,* 81 F.3d at 830. The ALJ may not reject the uncontroverted opinion or ultimate conclusions of a treating physician (or examining physician) without providing "clear and convincing" reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830-31. "The ALJ can meet this burden by setting out a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes,* 881 F.2d at 750 (quotations and citation omitted).

2. **Medical Source Evidence**

(a) **Dr. Seth Kagan (Consultative Physician)**

The state agency referred Merrill to Dr. Seth Kagan, a consultative examiner, for a one-time examination. On May 17, 2011, Dr. Kagan examined Merrill for thirty minutes. (Tr. 203.) Dr. Kagan diagnosed Merrill with moderate to severe lumbar scoliosis, and a possible rotator cuff impingement of the right shoulder. (Tr. 207.) Dr. Kagan observed that while Merrill had prominent Heberden's nodes[2] on the last joints of her fingers, the nodes were not tender, and he found no related functional limitations. (Tr. 205.) Dr. Kagan concluded that Merrill had no limitations on standing, walking, or sitting, and her carrying capacity was limited to 50 pounds occasionally, and 25 pounds frequently. (Tr. 207.) In addition, Dr. Kagan noted Merrill had no postural limitations, but was limited to frequent climbing and occasional crawling, secondary to limited range of motion for the right shoulder and neck. (Tr. 207.) Dr. Kagan limited Merrill to reaching occasionally, secondary to range of motion limits of the right shoulder, but assessed no limitations to handling, fingering, or feeling. (Tr. 207.)

---

[2] Heberden's nodes are hard or bony swellings that can develop in the distal interphalangeal joints (the joints closest to the end of the fingers and toes). Medical Dictionary: Medline Plus, http://www.merriam-webster.com/medlineplus/Heberden%27s%20node (last visited Sept. 21, 2015).

####        (b)        Dr. John LeBow (Treating D.O.)

John LeBow, D.O.,[3] Merrill's treating physician, examined Merrill initially on August 24, 2010. Merrill sought treatment for a persistent film over her eye, and scoliosis. Dr. LeBow assessed Merrill with scoliosis, tendonitis in her right shoulder, "very mild early cataracts," and osteopenia.[4] (Tr. 219.) Dr. LeBow did not order X-rays for the scoliosis, "given [Merrill's] overall good health." (Tr. 219.) Dr. LeBow instructed Merrill to follow up as needed. (Tr. 219.)

Over one year later, in September 2011, Merrill sought treatment from Dr. LeBow for headaches. (Tr. 216.) After examination, Dr. LeBow assessed Merrill with headaches due to muscle contraction, secondary to migraine headaches. (Tr. 216-217.) Dr. LeBow treated Merrill by recommending continued use of Sumatriptan and Motrin, and initiating a prescription for Flexeril. (Tr. 217.) Dr. Lebow recommended that Merrill follow up in two months.

In January 2012, Merrill returned to Dr. LeBow for her follow-up visit. (Tr. 213.) Merrill reported she "had much improved headache control" with the Flexeril, but she was experiencing some swelling in the joints of her hands and right thumb. (Tr. 213.) Following his examination, Dr. LeBow assessed Merrill with osteoarthritis in her hand, headaches due to muscle contraction, and migraine headaches. (Tr. 213.) Merrill requested ibuprofen, instead of Flexeril, for her headaches, because Flexeril caused Merrill to feel very somnolent in excess of twelve hours. (Tr. 213.) Dr. LeBow recommended ibuprofen to treat the osteoarthritis and muscle contraction headaches, and

---

[3]  A doctor of osteopathic medicine, such as Dr. LeBow, is an acceptable medical source under the Social Security regulations. *See Gonzales v. Colvin*, No. 13-1421, 2014 WL 4656470, at *3 n. 3 (C.D. Cal. Sept. 17, 2014).

[4]  Osteopenia is a condition marked by a reduced bone mass of lesser severity than osteoporosis. Medical Dictionary: Medline Plus, http://www.merriam-webster.com/medlineplus/ osteopenia (last visited Sep. 23, 2015).

7 - FINDINGS AND RECOMMENDATION

continued use of Sumatriptan for the migraine headaches. (Tr. 213-14.) Dr. LeBow suggested

Merrill follow up as needed. (Tr. 214.) Dr. LeBow did not reference any functional limitations.

### (c)    Dr. Christopher Noonan (Examining Physician)

In May 2012, Merrill sought an evaluation for her disability claim. Dr. Lebow referred

Merrill to Dr. Christopher Noonan. (Tr. 225.) Dr. Noonan performed a physical evaluation, and

compared Merrill's current X-rays to X-rays from 28 years earlier. (Tr. 225, 227.) After the physical

examination, Dr. Noonan assessed Merrill with right thoracic idiopathic scoliosis, chronic pain, and

osteoporosis, but recommended only "conservative treatment." (Tr. 226.) After comparing Merrill's

prior and current X-rays, Dr. Noonan concluded that Merrill's scoliosis has progressed at a much

slower rate than a typical scoliotic curve:

> Her current films measure approximately a 49-degree right thoracic curve. That
> essentially means that over the past 28 years, her curve has progressed approximately
> 10 degrees.
>
> The typical scoliotic curve will progress at most about 1 degree a year. The curves
> become a problem in adulthood from a cardiopulmonary standpoint when they reach
> 70 to 80 degrees. It appears that her curve is substantially less than that, and would
> hopefully never be an issue for her in life.
>
> Overall, her scoliosis curve has progressed, but over the last 20 years, it has only
> progressed 10 degrees.

(Tr. 227.) Dr. Noonan did not reference any functional limitations.

### (d)    Dr. Sarah Cassell (Treating Specialist)

In August 2012, Dr. LeBow referred Merrill to Dr. Sarah Cassell, who specializes in arthritis

and rheumatic diseases. (Tr. 236.) Dr. Cassell performed a complete rheumatologic exam and found:

"R/L Herberden's and Bouchard's with some deformity." (Tr. 238.) After an initial visit, Dr. Cassell

noted there was tenderness in Merrill's hands (specifically, tenderness of the bilateral distal

interphalangeal ("DIP") joints, tenderness of the proximal interphalangeal ("PIP") joints of the right hand, and tenderness of the right first metacarpophalangeal ("MCP") joint without synovitis), decreased range of motion in the DIP and PIP joints bilaterally, spasmed and tender right trapezius, very limited neck extension, tender right musculature, and a painful right buttock. (Tr. 238.) However, at the second visit (on August 30, 2012), Dr. Cassell noted: "Heberden's and Bouchard's with some deformity but none were tender" and "[n]o MCPs were tender." (Tr. 236.)

Dr. Cassell assessed Merrill with osteoporosis, polyarthralgia,[5] hand pain ("[m]ost likely osteoarthritis"), scoliosis/right shoulder/neck pain, hip pain, chondrocalcinosis,[6] and possible Raynaud's disease.[7] (Tr. 236, 238.) Merrill declined hip X-rays, explained that she has experienced the limited range of motion in her shoulder for many years, and informed Dr. Cassell that she did not feel she needed more treatment for her hand pain. (Tr. 236, 238.) Merrill's treatment plan included ibuprofen, calcium, vitamin D, and possibly starting the medication Alendronate to treat her osteoporosis. (Tr. 236, 238.) Dr. Cassell recommended weight bearing exercise, and did not reference any functional limitations. (Tr. 236.)

---

[5]  Polyarthralgia is defined as aches or pain in five or more joints. Medical Dictionary: Medline Plus, http://www.merriam-webster.com/medlineplus/polyarthralgia (last visited Sep. 23, 2015).

[6]  Chondrocalcinosis is a condition characterized by deposits of calcium pyrophosphate dihydrate crystals in one or more joints that eventually results in damage to the affected joints. Medical Dictionary: Medline Plus, http://www.merriam-webster.com/medlineplus/chondro (last visited Sep. 23, 2015).

[7]  Raynaud's disease causes some areas of the body – such as fingers and toes – to feel numb and cold in response to cold temperatures or stress. Medical Dictionary: Medline Plus, http://www.merriam-webster.com/medlineplus/raynaud%27s (last visited Sep. 23, 2015).

9 - FINDINGS AND RECOMMENDATION

###    3.    Weight Given to Dr. Kagan's Opinion

Merrill argues that the ALJ gave too much weight to Dr. Kagan's objective physical findings, in light of the fact that the ALJ then rejected Dr. Kagan's functional capacity assessment. (Pl.'s Brief 5.) The Court disagrees.

In his opinion, the ALJ gave "great weight to Dr. Kagan's objective findings (or lack thereof)," but ultimately rejects his functional capacity assessment. (Tr. 20.) The ALJ concluded that in light of Merrill's medical impairments, it was unreasonable for Dr. Kagan to expect that Merrill is capable of lifting, carrying, pushing, and pulling weight consistent with medium exertion. (Tr. 20.) Further, contrary to Dr. Kagan's assessment, the ALJ concluded that it is necessary to provide some limitations on Merrill's performance of manipulative activities "given her subsequent diagnosis of osteoarthritis of the hands and those parts of her testimony that were credible." (Tr 20.)

As an initial matter, the ALJ's careful review of Dr. Kagan's report inured to Merrill's benefit, because the ALJ did not take Dr. Kagan's functional capacity assessment at face value, which would have resulted in an RFC that did not appropriately reflect Merrill's limitations. Instead of taking Dr. Kagan's functional capacity assessment at face value, Dr. Kagan considered it in conjunction with the "subsequent diagnosis of osteoarthritis of the hands" (by Drs. Cassell and LeBow), as well as Merrill's own testimony. (Tr 20.) The ALJ carefully considered Dr. Kagan's functional capacity assessment in light of the entire record, and that analysis should have no impact on whether it was appropriate for the ALJ to give weight to Dr. Kagan's objective physical findings. *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (holding that "if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit"); *see also Soloriao-*

*Cardenas v. Colvin*, 1:13-cv-2324-HZ, 2015 WL 667559, at *5 (Feb. 15, 2015) (holding that the ALJ did not err in his evaluation of the medical evidence where he credited one opinion concluding that the claimant could perform light work, but gave more weight to a later opinion that assessed additional limitations).

In her Reply Brief, Merrill suggests that the ALJ must have given more weight to Dr. Kagan's findings of no tenderness in Merrill's hands than to Dr. Cassell's finding of tenderness in Merrill's hands, and that as a result, the RFC "was dramatically incompatible with the findings and observations from the treating specialist, Dr. Cassell." (Pl. Reply Br. 1-2.) Contrary to Merrill's suggestion, the ALJ never stated that he gave more weight to Dr. Kagan's assessment of no tenderness in Merrill's hands as compared to Dr. Cassell's assessment of tenderness (and indeed, Dr. Cassell found no tenderness at Merrill's follow-up visit). Rather, the ALJ rejected Dr. Kagan's assessment that Merrill should have no limitations on her performance of manipulative activities, in deference to the subsequent diagnosis of osteoarthritis of the hands (by both Drs. Cassell and LeBow). (Tr. 20.) Furthermore, Merrill's argument that Dr. Cassell's findings were "dramatically incompatible" with the RFC is not supported by the record, and the ALJ appropriately considered the fact that following a thorough rheumatologic exam, Dr. Cassell recommended only conservative treatment for Merrill's hand pain. (Tr. 20.)

For all of these reasons, the Court finds that the ALJ gave appropriate weight to both Dr. Kagan's objective findings, as well as his functional capacity assessment.

### 4.    Migraine Headaches as a Severe Impairment

Merrill also argues that the ALJ erred by failing to include Merrill's migraine headaches as a severe impairment at step two, and by failing to consider in the RFC the limitations caused by Merrill's headaches. (Pl. Br. 6-8.)

The ALJ found that Merrill has the following severe impairments: scoliosis, osteoporosis, right shoulder impingement, and arthritis. (Tr. 15.) The ALJ did not include migraine headaches as a severe impairment at step two. As an initial matter, the Court notes that Merrill did not allege disability due to migraine headaches in her disability application. (Tr. 148 (listing scoliosis, ostepenea, and rheumatoid arthritis in response to question asking claimant to "[l]ist all physical or mental conditions that limit your ability to work").) While Merrill testified at the hearing about "brain tumor feeling headaches" that her doctors had attributed to muscle contractions (Tr. 41, 47), she did not testify about migraine headaches or her inability to perform basic work activities because of her migraine headaches. "It is reasonable for an ALJ to assume that a claimant is not impaired by a condition that she does not allege impairs her[,]" *Plunk v. Astrue*, Case No. 6:11-cv-06286-SI, 2013 WL 1412942, at *5 (D. Or. April 8, 2013), and therefore, the ALJ did not err in failing to list migraine headaches as a severe impairment at step two.

In any event, as discussed below, the ALJ did properly consider Merrill's headaches later in the sequential analysis. Therefore, any error in failing to designate migraine headaches as a severe impairment at step two did not result in any prejudice. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that "[e]ven assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any error was harmless" where "[t]he decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4"); *cf. Burch v. Barnhart*, 400 F.3d 676, 682-84 (9th Cir. 2005) (any

error in omitting an impairment at step two was harmless when step two was resolved in claimant's favor).

The record reflects that the ALJ appropriately considered all of the medical evidence relating to Merrill's headaches. The ALJ noted Merrill's report to Dr. LeBow in August 2010 of her "[l]ong-standing history of migraine responding well to [S]umatriptan." (Tr. 17, 218.) The ALJ also noted Merrill's subsequent visit with Dr. LeBow, in September 2011, at which she reported migraine headaches that started with menopause, but were no longer of the same nature. Dr. LeBow assessed that Merrill was experiencing muscle contraction headaches superimposed on a history of migraine headaches, for which Dr. LeBow recommended that Merrill continue to take Sumatriptan, and Flexeril as needed for muscle spasms. (Tr. 17, 216.) The ALJ considered that in January 2012 Merrill told Dr. LeBow that she "had much improved headache control with the utilization of the Flexeril," but that one-half tablet caused drowsiness for more than twelve hours. (Tr. 18, 213.) Instead of Flexeril, Merrill requested ibuprofen for pain management, and Dr. LeBow prescribed 600 milligrams of ibuprofen, three times a day, for Merrill's less severe headaches. (Tr. 18, 213.) Merrill later reported to Dr. Noonan that she takes Motrin only once or twice per week, and Sumatriptan once or twice per month. (Tr. 231.) The ALJ acknowledged Merrill's testimony that she was having two to three debilitating headaches per week, but recognized that Merrill's testimony was refuted by the medical evidence. (Tr. 20.) The ALJ thoroughly considered all of the medical evidence relating to Merrill's headaches, and his omission of any limitations resulting from her headaches was not error.

13 - FINDINGS AND RECOMMENDATION

**B.      Claimant's Credibility**

Merrill argues the ALJ failed to provide clear and convincing reasons for rejecting her testimony. The Court finds that the reasons the ALJ provided were specific, clear and convincing, and supported by substantial evidence in the record.

**1.      Legal Standard**

The ALJ is required to engage in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter*, 504 F.3d at 1035-36. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan,* 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.* (emphasis in original); *see also Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

If a claimant meets the first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony only by offering specific, clear and convincing reasons for doing so." *Smolen,* 80 F.3d at 1281; *see also Carmickle v. Comm'r of the Soc. Sec. Admin.*, 533 F.3d 1155,

1160 (9th Cir. 2008) ("The only time this standard does not apply is when there is affirmative evidence the claimant is malingering.").[8]

### 2.    Merrill's Hearing Testimony

At the hearing, Merrill testified she stopped working as an apartment manager because she was no longer able to clean apartments, and the arthritis in her hands prevented her from doing the accounting work. (Tr. 34.) Merrill testified she has not worked since that time. (Tr. 34.) Merrill was able to work as an apartment manger because she took frequent small breaks in an apartment attached to the office. (Tr. 34.)

Merrill testified that her condition is progressive. (Tr. 35, 37.) She drops most things and has difficulty holding a pencil or using a keyboard. (Tr. 35.) Merrill experiences pain when using her hands and she must "scoop[]" items rather than grab or hold them. (Tr. 36.) She is able to write using a large pen, but cannot hold even a large pen in the traditional manner. (Tr. 36-37.) In addition, Merrill is unable to keyboard without pain and she must hold a stylus in her fist to use the credit card machine at the grocery store. (Tr. 37.) Merrill testified she is unable to tie her shoes and must use elastic shoe ties. (Tr. 37.) Merrill also experiences osteoarthritis in her knees. Specifically, after walking a mile she experiences burning and pain in her knees. (Tr. 39.)

Merrill testified about an impairment in her right shoulder as a result of her scoliosis. The resulting curve "affects [her] right shoulder going into the scapula area into [her] neck." (Tr. 40.) This condition causes her difficulty when she attempts to reach overhead with her right hand, and

---

[8] The Commissioner disputes this standard of review. (Def.'s Brief 5 n.1.) His argument is foreclosed by the Ninth Circuit's decision in *Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) ("There is no conflict in the case law, and we reject the government's argument that *Bunnell* excised the 'clear and convincing' requirement. We therefore review the ALJ's discrediting of Claimant's testimony for specific, clear, and convincing reasons.").

15 - FINDINGS AND RECOMMENDATION

limits her range of motion. (Tr. 40.) At times, when she lifts things, the scoliosis causes muscle spasms in the left side of her neck, causing "brain tumor feeling headaches." (Tr. 41.) The resulting pain is so severe that Merrill takes medication and goes to bed. These events can occur as often as two or three times a week depending on her activity level. (Tr. 41.) Once her headache is "touched off" it lasts for two or three days, and Merrill is unable to perform any work. (Tr. 47, 48.) While Merrill may go up to two weeks without a headache or stiff neck, the headaches can occur two or three times per week. (Tr. 48.) The headaches are directly related to her activity level. (Tr. 48.)

Merrill uses Motrin for inflammation, Tramadol for pain, and Sumatriptan for headaches. (Tr. 42-43.) She testified that she does not use much medication because the side effects impair her ability to think, concentrate, and function. (Tr. 43.) Merrill used to take Flexeril, but stopped because it made her nauseous. (Tr. 43.) The best remedies are Motrin, heat packs, stretching, and resting. (Tr. 43.) Merrill also uses a transcutaneous electrical nerve stimulation ("TENS") unit, which is helpful with pain in her right shoulder. (Tr. 43.) Due to financial considerations, Merrill relies mostly upon "home remedies" and medication to manage her pain. (Tr. 45.)

Merrill is unable to drive when she has a headache or a stiff neck. She does some grocery shopping, but is unable to lift a gallon of milk. (Tr. 48.) Merrill testified she can comfortably lift five to ten pounds. (Tr. 41-42.) Merrill often lies on a hard surface and takes a break from her household chores, every fifteen to twenty minutes. (Tr. 45.) Merrill is able to stand for a maximum of twenty minutes. (Tr. 40.) Merrill stated her maximum "time up" each day is 45 minutes at a time. (Tr. 46.)

### 3.    The ALJ's Credibility Assessment

At the first step of the credibility analysis, the ALJ determined that Merrill's underlying medically determinable impairments could reasonably be expected to cause her alleged symptoms.

(Tr. 19.) There was no evidence of malingering and therefore the ALJ was required at the second step of the credibility analysis to provide clear and convincing reasons for rejecting Merrill's testimony. *See Lingenfelter*, 504 F.3d at 1036. In assessing Merrill's credibility, the ALJ concluded that "[b]ased on the overall evidence of the record . . . the claimant's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms are less than fully credible. . . ." (Tr. 20.) The ALJ cited several reasons for this adverse credibility finding.

First, the ALJ determined Merrill was not fully credible with regard to her hand limitations, because "[t]he objective findings . . . did not provide sufficient support for the degree of limitation [Merrill] alleged." (Tr. 20.) Specifically, the ALJ cited Dr. Kagan's finding in May 2011 that Merrill had no significant manipulative difficulties. (Tr. 20, 206.) An ALJ may reject a claimant's statements about the severity of her symptoms and how they affect her, if those statements are inconsistent with or contradicted by the objective medical evidence. *See, e.g., Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (noting that "[t]he ALJ also identified several contradictions between claimant's testimony and the relevant medical evidence"). Here, the ALJ explained that Merrill's claimed degree of limitation with regard to her hands was inconsistent with the objective medical evidence. The ALJ's explanation is clear and convincing, and supported by substantial evidence in the record.

The ALJ also found Merrill's testimony regarding her hand limitations not credible because Merrill reported to Dr. Cassell in August 2012 that with regard to her hand pain, she "does not feel she needs more treatment." (Tr. 236 ("She takes IBUPROFEN 600 p.o. b.i.d. and would like to continue this.").) Evidence of "conservative treatment" is sufficient to discount a claimant's testimony regarding severity of an impairment. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007);

17 - FINDINGS AND RECOMMENDATION

*see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (affirming ALJ's decision to reject claimant's credibility in part because claimant chose a conservative course of treatment). Merrill's preference for conservative treatment was a specific, clear, and convincing reason for the ALJ to question her proffered limitations.

The ALJ also discredited Merrill because she "made inconsistent statements on the record." (Tr. 20.) Specifically, the ALJ found that Merrill made inconsistent statements about why she stopped working, the frequency of her headaches, and her functional limitations. (Tr.20.) In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." *Smolen*, 80 F.3d at 1284.

Merrill initially reported that she stopped working as a property manager in 2010 "[b]ecause of other reasons," that were not associated with alleged disabling impairments. (Tr. 148.) The Disability Report she completed, Form SSA-3368, asks a claimant if the claimant stopped working "because of my condition(s)" or "because of other reasons." Merrill reported she stopped working "because of other reasons," and added, "I quit." (Tr. 148.) At the hearing before the ALJ, Merrill testified that she was no longer able to work because of her condition, but that she was reluctant to tell her employer that she was leaving due to her impairments so, instead, she "put a resignation in and said we're leaving and we both quit," when her husband decided he wanted to work full-time at a different job. (Tr. 34.) She acknowledged at the hearing that at the time of her resignation, her husband wanted to obtain full-time employment, and that, thereafter, he obtained a new position working at a downtown office building. (Tr. 34.) In light of the fact that Merrill's husband resigned at the same time Merrill resigned, that he resigned for reasons independent of Merrill's reasons, that

18 - FINDINGS AND RECOMMENDATION

Merrill did not inform her employer that she was resigning because of her condition, and that Merrill reported in her Form SSA-3368 that she did not stop working because of her condition, Merrill's inconsistent statements regarding her resignation was a specific, clear, and convincing reason to discredit her testimony, supported by substantial evidence in the record.

The ALJ also cited Merrill's inconsistent statements regarding the frequency of her headaches. Merrill testified that she can have severe "brain tumor feeling headaches" as frequently as two to three times a week, with activity, or as little as once every two weeks if she is sitting "and not doing much," and that the headaches are so bad that she "just take[s] medication and go[es] to bed." (Tr. 41.) Merrill's hearing testimony conflicts with Merrill's report to Dr. Noonan that she took ibuprofen only once or twice per week, and Sumatriptan only once or twice per month. (Tr. 20, 231.) Her inconsistent statements regarding her headaches was a specific, clear, and convincing reason, supported by substantial evidence, for the ALJ to question her credibility.

This Court finds that the specific reasons the ALJ cited to question Merrill's credibility – the lack of objective medical findings to support the degree of alleged hand limitations, evidence of conservative treatment, inconsistent statements about why Merrill stopped working in 2010, and inconsistent statements about the frequency of her headaches – are clear and convincing reasons for an adverse credibility finding, and those reasons are supported by substantial evidence in the record.[9]

---

[9] This Court finds that the other reasons cited by the ALJ (Merrill's failure to use modified eating, cooking, and writing utensils; her legible handwriting; lay testimony that she was able to "read & write" well; and Merrill's personal estimations of her functional capacity to Dr. Noonan as compared to her hearing testimony), are not supported by substantial evidence in the record. Nevertheless, the several other reasons cited by the ALJ were sufficient to support his adverse credibility finding. *See Carmickle*, 533 F.3d at 1161-63 (even if some of the ALJ's adverse credibility reasons are invalid, the court must nevertheless sustain the credibility finding if it remains supported by substantial evidence).

19 - FINDINGS AND RECOMMENDATION

C.    **Lay Witness Testimony**

Merrill also challenges the ALJ's evaluation of the third party statements submitted by Merrill's husband, Tony Garcia, and her friends, Barbara McCourtney and Dr. Frances Day. The ALJ gave "some weight to the third party statements in the record[,]" but the third party testimony did not influence the ALJ's findings: "[t]he undersigned also notes that while comments about the claimant taking frequent rest breaks, having limited endurance and/or being short of stamina may be demonstrative of the witnesses' experiences with her, the overall evidence of record did not support a medical need/basis for such observations." (Tr. 20.)

In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence that cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). Inconsistencies between the lay witness's testimony and the claimant's presentation to her treating physicians or activities of daily living is another reason. *Barber v. Astrue*, No. 1:10-cv-01432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

The ALJ noted that Garcia, McCourtney, and Dr. Day described Merrill as having limitations due to arthritic changes in her hands, needing to take frequent breaks, and having limited endurance. (Tr. 20, 198-200.) The ALJ noted, however, that these lay witness opinions were not consistent with evidence in the record, such as unremarkable physical examination findings by Drs. Kagan and Noonan. (Tr. 20, 213-221, 225-235.) For example, Garcia's remarks about Merrill's ability to type

were inconsistent with Dr. Kagan's medical finding of no decrease in function with repetition. (Tr. 20.) In addition, the lay witness statements were inconsistent with Merrill's own reporting that she took ibuprofen only once or twice per week, and Sumatriptan only once or twice per month. (Tr. 231.) The ALJ provided sufficiently specific and germane reasons for discounting the opinions of Garcia, McCourtney, and Dr. Day.

**D.    The RFC and VE Hypothetical**

Merrill asserts that the hypothetical posed to the VE did not include her "sitting restrictions, her hand limitations, or her limitation due to her headaches." (Pl.'s Brief 16.) "The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'" *Valentine v. Comm'r of the Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)). Therefore, "an RFC that fails to take into account a claimant's limitations is defective." *Id*. For all the reasons discussed above, the Court finds that Merrill's RFC is supported by substantial evidence in the record.

At step five, the burden of production shifts to the Commissioner to identify jobs existing in significant numbers in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c)(2); *see also* 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003) (clarifying allocation of burdens in the sequential evaluation process). The Commissioner meets her burden at step five when she relies on the testimony of a VE showing that representative occupations exist in "significant numbers" for an individual with the claimant's RFC, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

The ALJ asked the VE whether an individual with Merrill's vocational profile could perform a significant number of jobs in the national economy. (Tr. 22, 54-56.) The VE testified that an individual with Merrill's RFC and vocational profile could perform a significant number of jobs in the national economy, including the representative occupations of sorter, credit reference clerk, data examination clerk, and information clerk. (Tr. 22, 54-56.) The VE further testified that these representative occupations were classified at the sedentary level of physical exertion. (Tr. 22, 54-55.) This Court finds that the Commissioner met her burden of production at step five.

## IV. CONCLUSION

The Court respectfully recommends that the District Judge AFFIRM the Commissioner's decision.

## V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 24th day of September 2015.

STACIE F. BECKERMAN
United States Magistrate Judge

22 - FINDINGS AND RECOMMENDATION